OPINION *Page 2 
{¶ 1} HomeComings Financial Network, Inc. and GMAC Mortgage Corporation, appeal from the judgment of the Lake County Court of Common Pleas, entered upon a jury verdict, awarding Michael and Pamella Negrea $156,250 for breach of contract arising from appellants' foreclosure action against the Negreas. We affirm.
 {¶ 2} Mr. Negrea is a veteran of the Willoughby Police Department; Mrs. Negrea is a former employee of the Eastlake Building Department, now working as a graphic designer. They have three children. They have lived for twelve years at 901 Cottonwood Court, Eastlake, Ohio.
 {¶ 3} The Negreas' journey through earthly purgatory commenced August 31, 1999, when they refinanced their home through NationsCredit Financial Services Corporation, signing a note and mortgage for $221,590, with interest at 9.83 percent, and payments of $1,918.83 due the fourth day of each month. NationsCredit mishandled the account, losing checks. The Negreas started sending their payments by certified mail. December 21, 2001, NationsCredit corrected the account, acknowledging the Negreas were current with their payments, and further advising them that Fairbanks Capital Corporation would be servicing the account.
 {¶ 4} December 24, 2001, NationsCredit filed an action in foreclosure against the Negreas. The Negreas answered and counterclaimed, and commenced holding their mortgage payments. May 7, 2003, NationsCredit sold the account to HomeComings Financial Network, Inc., which substituted in as plaintiff in the foreclosure action on or about May 15, 2003. Later that year, GMAC Mortgage Corporation became the service provider on the account. *Page 3 
 {¶ 5} Eventually, the Negreas reached a settlement of this first foreclosure action. They paid $37,000; Fairbanks waived five months of payments, and all late charges, fees, and penalties. The settlement agreement provided that this would bring the Negreas' account current as of September 2003. The agreement further provided that Fairbanks would notify the four major credit bureaus to delete any derogatory comments regarding the Negreas' credit, and provide them a letter, should those comments reappear.
 {¶ 6} Even though they continued to make payments, the Negreas received a letter dated June 1, 2004, from GMAC stating they were in default since December 2003. They received a letter dated June 29, 2004, from GMAC, stating that GMAC had alerted the major credit bureaus they were current in their payments through March 2004. Thereafter, they received a letter dated October 5, 2004, from GMAC, stating they were in default since August of that year. Then, the Negreas received a letter from GMAC, dated November 11, 2004, admitting they were not in default. Thereafter, they received a letter from GMAC dated December 1, 2004, stating they were in default since July of that year.
 {¶ 7} Further, at some point appellants purchased insurance for the Negreas' house, claiming they were not maintaining insurance. Appellants charged the Negreas' account for the policy. The Negreas, in fact, did maintain homeowners' insurance, and repeatedly sent GMAC copies of it. GMAC only credited the Negreas' account for a small portion of the amount debited to purchase the duplicate insurance.
 {¶ 8} Throughout this ordeal, the Negreas kept sending their payments, either by certified mail, or signature receipt. They tried to clear up the matter by telephone. *Page 4 
They sent letters. Their attorney sent letters. They sent duplicates of checks which had cleared, but which had not been credited to their mortgage account. Sometimes, it took GMAC three or more months to post checks. GMAC repeatedly lost checks, requiring the Negreas to send replacements.
 {¶ 9} The Negreas testified at trial concerning the destruction of their credit rating, and consequent inability to find a replacement mortgage lender. They testified about the difficulty in obtaining car loans, or a loan so their daughter could attend college. They testified about their difficulty in obtaining reasonable rates for credit cards. They testified about their need to obtain extensions for filing their tax returns for two years, due to GMAC's failure to send them forms acknowledging their payment of mortgage interest. They testified that they paid more income tax than previously, due to their inability to deduct their payments of mortgage interest.
 {¶ 10} January 26, 2005, HomeComings filed an action in foreclosure against the Negreas. March 16, 2005, the Negreas answered the complaint, counterclaiming for breach of contract, negligence, breach of the implied covenant of good faith, fraud, violation of the Fair Debt Collection Practices Act, and intentional infliction of emotional distress. They further filed a third-party action, alleging the same causes of action contained in their counterclaim, against NationsCredit, Fairbanks, and GMAC.[1]
 {¶ 11} Motion practice ensued. By a judgment entry filed December 14, 2005, the trial court dismissed NationsCredit and Select Portfolio from the action. January 19, 2006, the Negreas filed for summary judgment on the foreclosure action against them. HomeComings failed to respond; and, by a judgment entry filed February 6, 2006, the *Page 5 
trial court granted the Negreas summary judgment.
 {¶ 12} February 23, 2006, jury trial commenced on the Negreas' counterclaims against HomeComings, and third-party complaint against GMAC. The causes of action remaining were for breach of contract, fraud, and violation of the Fair Debt Collection Practices Act, against both HomeComings and GMAC. February 27, 2006, the jury returned a verdict, finding Homecomings and GMAC liable in breach of contract to each of the Negreas in the amount of $78,125 (for a total of $156,250). The jury further found for HomeComings and GMAC on the fraud charges; and found them liable to each of the Negreas for one thousand dollars, and attorney fees, under the Fair Debt Collection Practices Act. The trial court entered the verdict as a judgment the following day.
 {¶ 13} Issues concerning the award of attorney fees remained before the trial court; and, the Negreas filed a motion for prejudgment interest. February 27, 2007, HomeComings and GMAC filed motion for a new trial or relief from judgment. By a judgment entry filed December 19, 2007, the trial court awarded the Negreas prejudgment interest from the date HomeComings filed its action in foreclosure, as well as attorney fees of $12,645.
 {¶ 14} January 17, 2008, HomeComings and GMAC noticed this appeal.
 {¶ 15} January 29, 2008, the trial court filed its judgment entry, denying HomeComing's and GMAC's motions for relief from judgment and for a new trial. April 16, 2008, the Negreas moved this court to strike the notice of appeal, since it was made before the trial court ruled on appellants' motions for relief from judgment and for a new trial. HomeComings and GMAC opposed. By a judgment entry filed August 5, 2008, we held that the notice of appeal would be treated as prematurely filed, App. R. 4(C), *Page 6 
and would be considered as having been filed immediately following the trial court's denial of appellants' motion for a new trial, cf. App. R. 4(B)(2).
 {¶ 16} HomeComings and GMAC assign two errors on appeal:
 {¶ 17} "[1.] The trial court erred by entering judgment on the jury's verdict awarding $156,250 on Appellees' breach of contract claim, as the award included amounts that are not recoverable as a matter of law.
 {¶ 18} "[2.] The trial court erred by entering judgment on the jury's verdict awarding $156,250 on Appellees' breach of contract claim, as the award was not supported by competent, credible evidence."
 {¶ 19} While denoted as two assignments of error, the thrust of appellants' argument on appeal is that the figures do not add up. Relative to the breach of contract claim, the Negreas' trial counsel, in closing argument, asked for $184,947.40, divided between $133,947 in "compensatory" damages, and $25,000.00 each to Mr. and Mrs. Negrea for emotional distress.[2] As HomeComings and GMAC correctly note, damages for emotional distress cannot arise from a breach of contract claim under Ohio law.
 {¶ 20} Further, many of the component items making up the balance of the Negreas' breach of contract damages' claim may have been unrecoverable.
 {¶ 21} "In a breach of contract action, the award of money damages is designed to place an aggrieved party in the same position that he or she would have been had the contract not been breached. Buckley v.Ollila (Mar. 3, 2000), 11th Dist. No. 98 T-0177, 2000 Ohio App. LEXIS 787, *7-8. That is, damages are to be compensatory in nature and not punitive. Id. at 8. A party should not be placed in a better position than *Page 7 
if the contract had not been breached. Brads v. First Baptist Church ofGermantown (1993), 89 Ohio App.3d 328, * * *.
 {¶ 22} "The party seeking damages in a breach of contract action bears the burden of proving the nature and extent of his or her damages in order to be entitled to compensation. Akro-Plastics v. DrakeIndustries (1996), 115 Ohio App.3d 221, 226, * * *. As a result, an injured party cannot recover damages for breach of contract in excess of the amount that is established by the evidence with reasonable certainty. Cordy v. D G Pools, Inc. (Dec. 26, 1997), 11th Dist. No. 97-T-0079, 1997 Ohio App. LEXIS 5849, *5." Nelson Sand Gravel, Inc. v.Ring, 11th Dist. No. 2001-A-0058, 2002-Ohio-6467, at ¶ 17-18. (Parallel citations omitted.)
 {¶ 23} In this case, the Negreas demanded $65,810, the amount they alleged they had paid on the subject mortgage and note, for appellants' breach of the same. They demanded the full amount of the $37,000 they paid for the settlement of the first foreclosure action, even though the (disputed) evidence only indicated that appellants may have misapplied part of that money. Normally, these amounts should not be available to the Negreas for appellants' admitted breaches of contract, since a complete return to them of these funds would mean the Negreas were being put in a better position than they would have been without appellants' breaches: i.e., they get to live in their house for free.
 {¶ 24} The award is higher than that requested by the Negreas' trial counsel; it is much higher than the $60,000 suggested by appellants' trial counsel as being adequate recompense. However, the circumstances in this case are not normal. No objection to the introduction of these possibly improper items relating to damages was made by *Page 8 
appellants' trial counsel; the jury was not polled; the issue was not raised by appellants when moving for a new trial.
 {¶ 25} "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself. * * *" Goldfuss v.Davidson (1997), 79 Ohio St.3d 116, at the syllabus. (Citations omitted.)
 {¶ 26} The possibility of miscalculation of breach of contract damages in this case simply does not leap the high barrier imposed by the civil plain error standard. A reading of the trial transcript indicates that appellants' counsel's failure to object to the potentially improper items of damage may have been trial strategy: clearly, he concentrated his defense on (successfully) defeating the Negreas' colorable fraud claims against appellants. That being so, to reverse the damage award in this case would verge on violating the "invited error" doctrine, the principle that, "[a] party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make."Lester v. Leuck (1943), 142 Ohio St. 91, at paragraph one of the syllabus. We cannot have trials, preceded and followed by lengthy and involved motion practice — then overturn the judgments entered, based on issues obvious at the time of trial, as to which a party neither inquired nor objected.
 {¶ 27} The assignments of error are without merit.
 {¶ 28} The judgment of the Lake County Court of Common Pleas is affirmed. *Page 9 
 {¶ 29} It is the further order of this court that appellants are assessed costs herein taxed.
 {¶ 30} The court finds there were reasonable grounds for this appeal.
CYNTHIA WESTCOTT RICE, J., concurs,
MARY JANE TRAPP, J., concurs in judgment only.
[1] Fairbanks' name, by this point, was actually "Select Portfolio Servicing, Inc."
[2] As appellants note, the total requested includes $1,000.40 above the individual amounts. *Page 1